

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| BRAD K. and JENNIFER K.,<br>individually and as next friend of<br>Jessica K., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 10 C 0534 |
| BOARD OF EDUCATION OF THE<br>CITY OF CHICAGO, CHICAGO<br>PUBLIC SCHOOL DISTRICT #299, | ) ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Jessica K., who was born in June 2003, is a developmentally delayed girl with speech, language, and motor skill limitations. She lives with her parents in the City of Chicago. Jessica previously attended a preschool that is part of the Chicago Public School System ("CPS"). Following February 2008 meetings, an Individual Education Program ("IEP") was developed. *See* A.R. 376-416. It was later determined that the placement for implementing the IEP would be Hamilton School, which is Jessica's neighborhood school. The parents objected to this placement and instead chose to place her at Keshet School in the Chicago suburb

of Northbrook, which is where she continues to attend. Contending the IEP was procedurally and substantively deficient, the parents sought reimbursement for the costs of sending Jessica to Keshet. Following a hearing, the Independent Hearing Officer ("IHO") denied reimbursement, denied a prospective placement at Keshet, and ordered that, should Jessica be re-enrolled in CPS, the February 2008 IEP would be implemented with the additional provisions of (a) having a one-to-one aide from the time she gets off the bus until she gets back on the bus and (b) having 30 minutes a week of a specialist/consultant advising Jessica's teachers regarding facilitating mainstreaming.

Jessica's parents filed the present lawsuit as next friends of Jessica. Plaintiffs seek relief overturning the IHO's decision and requiring that CPS reimburse the prior costs of Keshet and provide for prospective placement at Keshet. Plaintiffs contend the Individual with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, was violated in that the IEP does not meet the substantive educational requirements for providing a Free Appropriate Public Education ("FAPE") and the IEP was developed without following proper procedure. Plaintiffs also contend the same relief should be granted because of violations of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. § 12132, in

- 2 -

that Hamilton School was not accessible because it required traversing more steps

that Jessica was capable of handling.  Presently pending are the parties' cross

motions for summary judgment.

Under IDEA, the party challenging the outcome of the administrative

hearing bears the burden of persuasion before this court.  *Marshall Joint Sch.*

*Dist. No. 2 v. C.D. ex rel. Brian D.*, 616 F.3d 632, 636 (7th Cir. 2010).  On issues

of law, no deference is due the IHO's determination.  *Id.*  When, as here, no

evidence is submitted to supplement the administrative record, considerable

deference is given to the IHO's factual findings.  *Id.*  Review in such situations is

equivalent to administrative review of the decision of a government agency.

Factual determinations of the IHO should be upheld unless the court is strongly

convinced there is factual error.  This is akin to the clear error and substantial

evidence standards.  *Sch. Dist. of Wis. Dells v. Z.S. ex rel. Littlegeorge*, 295 F.3d

671, 675 (7th Cir. 2002); *Indianapolis Pub. Sch. v. M.B. ex rel. Rosilyn B.*,

___ F. Supp. 2d ___, 2011 WL 304775 *1 (S.D. Ind. Jan. 25, 2011).  Like the

IHO, the court is to give deference to the opinions of professional educators as

regards educational issues.  *Heather S. v. State of Wis.*, 125 F.3d 1045, 1057

(7th Cir. 1997); *Richard Paul E. v. Plainfield Cmty. Consol. Sch. Dist. 202*,

2009 WL 995459 *17 (N.D. Ill. April 9, 2009); *Keith H. v. Janesville Sch. Dist.*,

305 F. Supp. 2d 986, 997 (W.D. Wis. 2003); *Edwin K. v. Jackson*, 2002 WL 1433722 *17 (N.D. Ill. July 2, 2002). The same deference does not necessarily apply to psychologists and other non-educators involved in developing the IEP. *Heather S.*, 125 F.3d at 1057; *Edwin K.*, 2002 WL 1433722 at *17; *Reed v. Lincoln-Way Cmty. High Sch. Dist.*, 2000 WL 696793 *9 (N.D. Ill. May 30, 2000). "Federal courts must defer to the judgment of education experts who craft and review a child's IEP so long as the child receives some educational benefit and is educated alongside his non-disabled classmates to the maximum extent possible." *Z.S.*, 295 F.3d at 676-77 (quoting *Gill v. Columbia 93 Sch. Dist.*, 217 F.3d 1027, 1038 (8th Cir. 2000)).

IDEA provides for reimbursement of the costs of private special education if the public school fails to provide a FAPE. *Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2492 (2009). Reimbursement is appropriate if both the school district fails to provide a FAPE and the private placement was suitable. *Id.* at 2496; *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12 (1993); *Todd v. Duneland Sch. Corp.*, 299 F.3d 899, 905 (7th Cir. 2002); *M.B. ex rel. Rosilyn B.*, 2011 WL 304775 at *2. Here, the parties stipulated that Keshet School is a suitable placement so the second requirement is not at issue.

A school district fails to provide a FAPE if it fails to follow proper procedures or the IEP is not reasonably calculated to provide some educational benefit to the child. *Todd*, 299 F.3d at 905. A FAPE is substantively sufficient if it provides some educational benefit and is appropriate for the individual child; it is not necessary that it provide the best possible education nor does it matter that the placement chosen by the parents is better. *Heather S.*, 125 F.3d at 1057; *M.B. v. Hamilton Se. Sch.*, 2010 WL 3168666 *6-7 (S.D. Ind. Aug. 10, 2010); *James D. v. Bd. of Educ. of Aptakisic-Tripp Cmty. Consol. Sch. Dist. No. 102*, 642 F. Supp. 2d 804, 816 (N.D. Ill. 2009); *Jamie S. v. Milwaukee Pub. Sch.*, 2009 WL 1615520 *32 (E.D. Wis. June 9, 2009). The IEP still must be reasonably calculated to provide educational benefits that are more than trivial and likely to produce progress, not regression. *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221*, 375 F.3d 603, 615 (7th Cir. 2004); *Jaccari J. v. Bd. of Educ. of City of Chicago, Dist. No. 299*, 690 F. Supp. 2d 687, 701-02 (N.D. Ill. 2010); *James D.*, 642 F. Supp. 2d at 816. Factors to consider in making such a determination include: "(1) the child's potential; (2) whether his IEPs were tailored to his unique needs; (3) whether his IEPs provided access to specialized services; (4) whether they addressed disability-related disruptive acts; and (5) whether the child achieved progress during the relevant time period."

*Jaccari J.*, 690 F. Supp. 2d at 702. While denial of proper procedures can support reimbursement for a private placement, reimbursement is not appropriate based on procedural error alone if the placement offered would have been timely provided and meet the substantive requirements for a FAPE. *Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1065-66 (7th Cir. 2007); *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125-26 (10th Cir. 2008); *M.B.*, 2010 WL 3168666 at *5; *James D.*, 642 F. Supp. 2d at 816; *Stanley C. v. M.S.D. of Sw. Allen Cnty. Sch.*, 628 F. Supp. 2d 902, 922, 983 (N.D. Ind. 2008). *See also Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 276 (7th Cir. 2007) (quoting *Heather S.*, 125 F.3d at 1059).

Jessica's 2008 IEP provides for 750 minutes per week, which is a half-day program. The IEP does not identify a specific location for its implementation. Plaintiffs' only substantive objection to the IEP is that it provides for a half-day program instead of a full-day program. Plaintiffs do not identify any specific services or goals with which they disagree. Plaintiffs also contend the IEP is deficient because it does not identify the location (that is the particular school or facility) for implementing the IEP. The location determination (Hamilton) was unilaterally made by a Central Office administrator, CPS Placement Coordinator Diane Rohan. Rohan based her placement determination on what was contained in

the February 2008 IEP, but did so outside the IEP process itself and without further consulting Jessica's parents or the staff who participated in developing the IEP. Regardless of the provisions of the IEP, plaintiffs contend the program at Hamilton does not sufficiently meet Jessica's needs and would not provide even some educational benefits. Plaintiffs also complain that Hamilton School is not accessible to Jessica. The IEP itself does not mention a need for an accessible classroom. To get into the classroom at Hamilton, 18 steps must be climbed and the same steps must be descended to get back out of the building. Jessica, however, was only capable of climbing or descending six steps at a time. One of her 2008 IEP annual goals was to do eight steps at a time.

Defendant contends the actual school location for implementing an IEP is not and was not required to be included in an IEP. Defendant further contends that Hamilton offered a sufficient program to satisfy the IEP and meet Jessica's needs, but, even if it did not, defendant should have had the opportunity to provide another suitable location for implementing the IEP before being required to reimburse plaintiffs for a private placement. Defendant also contends that assistance would have been provided to transport plaintiff to and from the classroom.

Citing *Madison Metro. Sch. Dist. v. P.R. ex rel. Teresa R.*, 598

F. Supp. 2d 938, 949-50 (W.D. Wis. 2009), plaintiffs contend that the physical

location for services (in Jessica's case, the particular school) is part of the IEP.

The Seventh Circuit has not reached this issue.[1] This court respectfully disagrees

with the conclusion reached in *Madison* and *A.K.* The Second Circuit and Fifth

Circuit have held otherwise.

Although 20 U.S.C. § 1414(d)(i)(A)(i)(VII) includes "location" in its

definition of "educational placement," DOE commentary regarding a related

regulation clarifies that location as used in the statute and regulations is more

broadly defined than the physical location for providing services: "location of

---

[1]In support of its conclusion, the *Madison* court cites *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 680 (4th Cir. 2007), and 20 U.S.C. § 1414(d)(i)(A)(i)(VII). It also cites *Bd. of Educ. of Cmty. High Sch. Dist. No. 218, Cook Cnty., Ill. v. Ill. State Bd. of Educ.*, 103 F.3d 545, 549 (7th Cir. 1996), as do plaintiffs *Dist. No. 218*, however, is readily distinguishable. That case concerned the applicability of IDEA's stay-put provision when a student is expelled. In that case, the Seventh Circuit recognized that "educational placement" as used in the IDEA had been given varying interpretations based on the factual context of each particular case. Citing suspension cases, the Seventh Circuit held that, in expulsion cases, "educational placement" should be construed as including the physical location of the placement. It specifically limited that construction to expulsion or suspension cases, leaving open whether educational placement should be so construed for other purposes. There is no binding Seventh Circuit precedent as to how to construe placement for present purposes. *Dist. No. 218* was decided prior to the Department of Education ("DOE") clarification cited *infra* in the text. Also, neither *A.K.* nor *Madison* consider the DOE clarification.

services in the context of an IEP generally refers to the type of environment that is the appropriate place for provision of the service. For example, is the related service to be provided in the child's regular classroom or resource room?" *T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 419-20 (2d Cir. 2009) (quoting *Assistance to States for the Educ. of Children with Disabilities & the Early Intervention Program for Infants & Toddlers with Disabilities*, 64 Fed. Reg. 12406, 12594 (March 12, 1999)[2]). *See also* **White ex rel. White v. Ascension Parish Sch. Bd.**, 343 F.3d 373, 379 (5th Cir. 2003). The physical location for implementing an IEP need not be included in the IEP. Regardless of whether the location must be stated in the IEP, placing a student at a location where the IEP cannot be implemented would be a failure to provide adequate educational benefits.[3]

Plaintiffs contend the placement at Hamilton is improper because it did not offer the type of services that would benefit Jessica. In other words, they contend the IEP could not have been implemented at Hamilton. The IHO found,

---

[2]The DOE commentary was in response to public comments that the meaning of "location" as used in 34 C.F.R. § 300.347(a)(6) (1999) (now incorporated in 34 C.F.R. § 300.320(a)(7)) should be clarified. The DOE did not modify the language of the proposed regulation that was being finalized, but the commentary clarifies the agency's intended meaning.

[3]Even if it was error to fail to include the location in the 2008 IEP and/or to fail to consult with the parents or IEP staff before selecting Hamilton as the location, as discussed above, plaintiffs would still have to show that such procedural error contributed to Jessica being denied adequate educational benefits.

based on testimony, that Hamilton would have provided Jessica with an adequate

FAPE. The IHO recited the proper legal standard for a FAPE.

> The parameters for adequacy of a student's IEP were set forth in **_Bd. of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley_**, 458 U.S. 176 (1982). The United States Supreme Court determined that the student's IEP must be reasonably calculated to provide the student with some educational benefit. The court in **_Rowley_** concluded that the Individuals with Disabilities Education Act (IDEA) did not require school districts to provide special education students with the best education available or to provide instruction or services that maximize the student's abilities. Instead, the Court stated that school districtsare required to provide only a "basic floor of opportunity" that consists of access to specialized instruction and related services which are individually designed to provide some educational benefit to the student. **_Rowley_**, at 207-208.

> To determine whether the school district offered Jessica FAPE, the analysis must focus on the adequacy of the school district's proposed program, in this case, the early learning class at the Hamilton School, her neighborhood school. If the district's proposed program addresses the student's needs, provides her with some meaningful educational benefit, and comports with her IEP, then the district offered a FAPE even if the parents preferred another program and even if the parents' referred program would likely result in a greater educational benefit. **_Rowley_**, 485 U.S. at 207-208.

A.R. 18.

Based on the testimony of case manager Dorothy Kelly, who has an

education degree and experience as a school counselor, the IHO found:

> Ms. Kelly testified that the IEP team never discussed placing
> Jessica in a full-time program. The parents never requested
> an accessible building. The parents never dissented from the
> IEP. A full-time placement was not discussed, was not
> warranted and in her opinion the proposed IEP was
> appropriate.
>
> At the IEP meeting, the parents did not request for Jessica to
> be placed in a more restricted environment. Rather, they
> asked for Jessica to be included with the regular education
> students. They were instrumental in providing for the
> justification of placement in the LRE. P's Ex. 22, Sec. 14,
> p. 214. The team could have written and [sic] IEP for a full-
> time program if it were deemed appropriate. Students age out
> of the early childhood program at age six. In February, 2008,
> Jessica was only five. Thus, she was still eligible for the early
> childhood program. In her opinion, the IEP provided FAPE.

A.R. 13-14.

The IHO made the following findings regarding the testimony most

pertinent to whether the Hamilton early childhood classroom could provide

adequate services. Dr. Ruth Kraus, who has a doctorate in educational and

developmental psychology, was retained by the K.'s to provide an evaluation of

Jessica. Dr. Kraus also went to Hamilton to find out about the services it could

provide. Based on Dr. Kraus's testimony, the IHO found:

> Dr. Kraus opined that Jessica's language and cognitive skills
> were similar to that of an autistic child but her strengths were
> in the area of social functioning. She felt Jessica needed to be
> around typical functioning peers. Dr. Kraus further testified
> that Jessica needed to be in a self-contained classroom due to
> her cognitive functioning, and for assistance with her
> communication and motor needs in addition to her self-help
> needs, e.g., toileting, dressing, personal hygiene. She also felt
> that mainstreaming would be helpful to her in learning,
> describing her as an "excellent imitator" who learns from
> models. Dr. Kraus believed that a half-day program was not
> acceptable for Jessica and would not provide enough
> intervention to meet her needs.

> Dr. Kraus observed Hamilton School and described the
> classroom as a typical early childhood instructional
> classroom. She was concerned that the entrance to Hamilton
> included 18 steps and that Jessica had difficulty ambulating
> and was only working on maneuvering around five or six
> steps at the time. She observed that the other students were
> higher functioning than Jessica and they were all verbal. The
> regular teacher was not in the class at the time of her
> observation, rather, a substitute teacher was present. In
> conclusion, Dr. Kraus did not believe that Jessica could have
> derived an educational benefit from a placement at Hamilton
> for the above reasons. On the other hand, Dr. Kraus observed
> Jessica at Keshet School and did believe that it would provide
> Jessica with FAPE.

> Dr. Kraus believes that mainstreaming is important for
> Jessica. She also testified that for mainstreaming to be
> successful, there must be a culture in the school accepting of
> it. Allegedly, she had been told that Hamilton School did not
> provide for mainstreaming and did not have an inclusion
> specialist. She also believes that Jessica needs a one-to-one

aide because of her mouthing issues which become a safety
concern since she puts everything in her mouth.

A.R. 15-16.

James Gray, the then-current principal of Hamilton, testified regarding

the services available at Hamilton. Gray had been the principal of Hamilton since

July 1, 2009, which was the school year following Jessica's proposed Fall 2008

enrollment. Based on Gray's testimony, the IHO found:

> Hamilton is Jessica's neighborhood school located just
> 4 blocks from her home. There are 254 students in the school
> including both general and special education. They have
> three pre-kindergarten programs: (1) A tuition based
> preschool which meets from 7:30 a.m. to 5:30 p.m.; (2) A
> hard-of-hearing class for three to five year olds; (3) An early
> childhood special educational instructional class which meets
> half a day for 150 minutes per day. There are a maximum of
> ten students in that classroom which includes two adults.
> Previously they had three adults which included one certified
> teacher and two teacher aides. The instructional services are
> all provided in the self-contained classroom along with related
> services such as OT, PT and speech. The program has been in
> existence for five years.
>
> Mr. Gray did not attend Jessica's IEP meeting but was familiar
> with it from having reviewed it prior to the hearing. Mr. Gray
> testified that Jessica's IEP could be implemented at Hamilton.
> All of the related services could also be provided to her in the
> classroom. The special education assistants in the classroom
> could assist with toileting, diapering, the AT devices and the
> mouthing issues. A bus aide or Child Welfare Attendant
> (CWA) is available to help students get off the bus and get
> into their classroom.

> According to the IEP, Jessica did not need an accessible school. The room in question is located right by the emergency room exit.

A.R. 16-17.

Peggy Walsh is a special education teacher at Hamilton. At the time of the September 2009 IHO hearing, she had been in that position for eight years.

Based on Walsh's testimony, the IHO found Walsh:

> teaches a morning program and an afternoon program each consisting of ten students. She has one aide. She testified that if a student's IEP provided for an inclusion, she would include them in classes with the tuition based preschool students such as for music, gym and recess. She stated that it was not unusual for students to need help with stairs and that she had several students with similar issues. Ms. Walsh described students in her class as having a wide range of disabilities including autism, cerebral palsy, Down's Syndrome, other health impaired and what you might expect to see in a cross categorical program. She has also taught students who have used augmentative communication devices.
>
> Ms. Walsh did see Jessica on one occasion in 2006. She also participated in her IEP. Jessica was never enrolled in her classroom as she was placed in the private school prior thereto. P's Ex. 19 and 22. The IEP team's recommendation was that Jessica be placed in an early childhood instructional program. The ultimate location was to be determined by the central office.

A.R. 17.

The IHO found that CPS had adequate resources to implement Jessica's

IEP. The IHO also made the following findings and conclusions.

> In this case it is clear that CPS has attempted to work with the parents, keep them informed and give them an opportunity for input into Jessica's educational programming. The parents participated in each and every one of Jessica's IEPs and were not only given an opportunity but in fact did provide input relative to Jessica's goals, objectives, modifications and accommodations. The parents were given ample opportunity to participate in Jessica's IEP, and in fact did so over two days, i.e., February 4, and 13, 2008. The parents were also given an opportunity to observe various classroom alternatives, none of which were acceptable to them. In the parents' minds, however, nothing CPS offered compared to the private day school at Keshet.

> * * *

> The parents object that all the other students in Hamilton's class are higher functioning than Jessica and that she would be the most severely disabled student in the class. Respectfully, this objection is not well founded. For one thing, in any class, there is always going to be some student who is the lowest functioning just as there is another student who is going to be the highest functioning. Further, there is nothing to state that another student more severely disabled than Jessica could move into the class tomorrow, in which case she would no longer be the most severely disabled student in the class. Thirdly, even if we assume that Jessica is the lowest functioning student in the class, the evidence supports the finding that she would derive some educational benefit from the program. The IEP, some 27 pages long, is

- 15 -

individually tailored to meet her needs. P's Ex. 22,
pp. 190-217.

The parents assert that CPS has procedurally violated IDEA in
that the persons making the ultimate placement decision for
Jessica have never met her. Respectfully, the parents' position
misses the mark. The point is that the IEP drafted for Jessica
was drafted by her actual teachers and service providers who
did have personal knowledge of Jessica, all of whom possess
the proper academic credentials, certifications and varying
levels of experience and expertise. The mere fact that the
ultimate location of the placement is determined by an
administrator in a central office does not violate the
procedural mandates of IDEA.

The key in the IDEA "procedural violation" cases centers on
the loss of educational opportunity or the loss of an
opportunity to participate in the process, neither of which is
the case here. *Evanston Comm. Consolidated School
Dist. 65 v. Michael M.*, 356 F.3d 798, 804 (7th Cir. 2004);
*Heather S. v. State of Wisconsin*, 125 F.3d 1045, 1059
(7th Cir. 1997). The IEP does not need to conform to the
parents' wishes in order to be deemed sufficient or
appropriate. In fact, "IDEA mandates individualized
appropriate education for disabled children, it does not require
a school district to provide a child with a specific educational
placement that [her] parents prefer." *School District of St.
Louis County: Missouri Dept. of Elementary and Secondary
Education*, 449 F.3d 816 (8th Cir. 2006) citing *Blackmon v.
Springfield R-XII School Dist.*, 198 F.3d 648 at 658 (8th Cir.
1999). In other words, even though the district did not agree
to provide the programming and placement of Keshet as
advocated by Jessica's parents, Mr. and Mrs. K. had a more
than ample opportunity to participate in the IEP formulation
process in a meaningful way, as the IEP team considered
parent suggestions and even incorporated some of them.

- 16 -

In conclusion, the hearing officer finds that the IEP drafted for Jessica on February 4 and 13, 2008 was reasonably calculated to provide her with a free and appropriate public education. The hearing officer does not find any procedural error in the school district's failing to determine Jessica's actual placement/location at the February IEP meeting, and finds that any failure on the part of CPS to advise Jessica's parents of her recommended placement for some four months following said meeting was, at best, "harmless error", since the new school program would not begin for 7 months until the fall (August/September) anyway. Therefore, the hearing officer respectfully denies the parents' request for both retroactive reimbursement and prospective placement at Keshet.

A.R. 20-21.

The IEP provided for early childhood education, a type of program available at Hamilton. The IHO recognized that a half-day program, which is all that Hamilton offered, satisfied the IEP. The IHO also recognized that Dr. Kraus had testified a half-day program would not meet Jessica's needs. If this were merely a matter of the IHO choosing to accept the determination of school personnel (including educators) that a half-day program was sufficient over a psychologist's determination that a full-day program was required, the court would defer both to the IHO's finding and the views of the educators that participated in developing an IEP. However, the school personnel did not affirmatively determine that a half-day program was sufficient for Jessica's needs. It is

uncontested that the school personnel involved in developing Jessica's IEP all

believed a half-day program was the only possible option and did not consider

whether that was sufficient to provide Jessica educational benefits. Kelly did

testify at the hearing that a full-day program was possible, but not necessary for

Jessica. Dr. Kraus did not opine as to whether Jessica could derive any

educational benefit from a half-day program. Dr. Kraus testified: "I absolutely

don't think [a half-day program would be appropriate]. . . . [S]he is still at a young

enough age where I think we can make a real difference for her by giving her a lot

of early intervention. And I think that half a day is just not going to give her

enough intervention to really meet the needs; . . . . So this time is really crucial to

give her as much as possible to help her become as independent as possible."

A.R. 1321 (Tr. 540-41). Similarly, in her psychological evaluation report, Dr.

Kraus stated: "Jessica would benefit from staying in a full-day kindergarten

program. She has demonstrated that she is able to be successful in such a

program, and the severity of her delay makes it imperative that she be provided

with a full day of instruction. A preschool program with a shorter day would not

be sufficient to meet her needs, and would also not be consistent with the

education provided in the regular kindergarten program in her district. A return to

a preschool program after she has been successful in a kindergarten program would not be appropriate." A.R. 241.

Clearly, it was Dr. Kraus's opinion that Jessica would benefit most from a full-day program. She also opined that a half-day program would not meet all of Jessica's needs. However, she never opined that a half-day program would provide only trivial or no educational benefits. The educators, though, determined that a half-day, early childhood (pre-kindergarten) program would provide educational benefits to Jessica. The IHO did not commit clear error in finding that Hamilton was not insufficient to provide some educational benefits simply because it was a part-day, early childhood program.

Plaintiffs also contend that Dr. Kraus's testimony shows that the actual services provided at Hamilton were insufficient to meet Jessica's needs. Dr. Kraus's testimony was based on observing activities in Hamilton's early childhood classroom for one morning. This class was ordinarily taught by Walsh, who was elsewhere during most of Dr. Kraus's observation. Walsh would have been Jessica's special education teacher if Jessica had enrolled at Hamilton in Fall 2008. At the time of Dr. Kraus's observation, the morning class included no nonverbal children and no communicative supports were being offered because no child needed such supports. Dr. Kraus opined that the class was being taught at

- 19 -

too high a level to provide any benefit for Jessica because Jessica did not have the

necessary language or cognitive skills. A.R. 1322-23. As plaintiffs point out,

Walsh provided no testimony directly addressing Jessica's 2008 IEP, which she

had not previously read in full since Jessica had never enrolled at Hamilton. A.R.

1337 (Tr. 603-04).[4] Walsh did testify that she had previously had children in her

classroom who required communicative devices and that, at Hamilton, children

could be mainstreamed for part of the time with the regular early childhood class

in the school. A.R. 1335 (Tr. 595-96). She also testified that she has had children

with a variety of developmental delay issues and autism. A.R. 1335 (Tr. 597).

Gray testified that Hamilton could provide all the services provided for in Jessica's

2008 IEP, including all the instruction contained therein; physical, occupational,

and speech therapy; aides to perform toileting, diapering, dressing, and feeding;

use of assistive devices; and mainstreaming time. A.R. 1332-33 (Tr. 584-87).[5] He

---

[4]Walsh participated in preparing Jessica's 2006 IEP; she did not participate in developing the 2008 IEP presently at issue. A.R. 1337 (Tr. 602).

[5]Gray did not begin at Hamilton until July 2009. There is no evidence that available services were different during the 2008-2009 school year that Jessica's IEP would have been implemented. Walsh's testimony supports that the program was the same both years. Plaintiffs point to statements then-principal of Hamilton Mila Strasburg made to Dr. Kraus on the day of Dr. Kraus's observation. A.R. 1323 (Tr. 546-47). Even taking as true that Strasburg's statements would be considered an admission of a party-opponent, not hearsay, Dr. Kraus's testimony does not establish what Strasburg's understanding of Jessica's needs were when Strasburg stated Jessica's needs cannot be met at

also testified that aides could handle the mobility issues Jessica has. A.R. 1333 (Tr. 587-89).

It was not clear error for the IHO to accept the principal's and special education teacher's testimony that the services called for in the IEP could be provided at Hamilton. He could accept this testimony over Dr. Kraus's observations that were based on observing a few hours of a classroom that happened to have the particular students enrolled at the time of the observation.

The IHO's finding that the placement at Hamilton is a satisfactory FAPE is supported by the evidence. Also, any possible procedural error did not deny Jessica a FAPE. Additionally, evidence supports the IHO's finding that aides would have been provided to ensure that Jessica could get into and out of the classroom and that the classroom was located near an exit to expedite emergency departures. Plaintiffs cite no provision of IDEA or case law or regulations that would be violated by using aides to provide access. Still to be addressed is plaintiffs' alternative contention that placing Jessica at Hamilton violated accessibility provisions of the Rehabilitation Act and ADA.[6]

---

Hamilton. The IHO could properly credit Gray's and Walsh's more detailed description of what Hamilton could provide for Jessica in determining that Hamilton could meet Jessica's needs.

[6]For convenience, the Rehabilitation Act and ADA claims will jointly be referred to as plaintiffs' "accessibility claims."

Unlike plaintiffs' IDEA claims, the accessibility claims do not involve a form of administrative review of the IHO's decision. Instead, ordinary summary judgment standards apply. To obtain summary judgment, plaintiffs must establish that every element of one or both of their accessibility claims are indisputably established. For defendant, obtaining summary judgment dismissing the accessibility claims requires that undisputed facts establish that at least one element of each claim is not satisfied. *Ross*, 486 F.3d at 276. Neither party, however, attempts to identify the particular type of claim being brought, *see Wis. Cmty. Servs, Inc. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006), nor the elements of the accessibility claims. Additionally, the parties do not address the issue of whether requiring defendant to pay Jessica's private school costs, the only monetary damage requested in plaintiffs' addenda, is an appropriate compensatory damages remedy under either Act.

Presumably, plaintiffs' ADA claim is based on Title II of the ADA.

> One claiming that a public program or service violates the ADA must establish "(1) that he [or she] has a qualifying disability; (2) that he [or she] is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his [or her] disability." *Frame v. City of Arlington*, 575 F.3d 432, 435 (5th Cir. 2009); *see also Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 752 (7th Cir. 2006) ("Title II case law . . . requires the plaintiff to show that, "but

- 22 -

for" his disability, he would have been able to access the services or benefits desired."); *Geiger v. City of Upper Arlington*, No. 2:05-cv-1042, 2006 WL 1888877, at *1 (S.D. Ohio July 7, 2006) ("In other words, the plaintiff must show that he was denied 'a public benefit' because he or she is disabled."). The plaintiffs may establish discrimination by presenting evidence that the defendant intentionally acted on the basis of the disability, the defendant refused to provide a reasonable modification, or the defendant's denial of benefits disproportionately impacts disabled people. *Washington v. Ind. High Sch. Athletic Ass'n, Inc.*, 181 F.3d 840, 847 (7th Cir. 1999). "Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden." *Toledo v. Sanchez*, 454 F.3d 24, 32 (1st Cir. 2006).

*Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 937 (N.D. Ind. 2009). Since CPS receives federal funds, the Rehabilitation Act applies to CPS. For present purposes, the Rehabilitation Act standards are essentially the same as those applied under Title II of the ADA. *See Wis. Cmty. Servs.*, 465 F.3d at 751-52; *Klene v. Trs. of Ind. Univ.*, 2010 WL 2985176 *5 (S.D. Ind. July 23, 2010).

Plaintiffs do not attempt to show that defendant intentionally discriminated against Jessica based on a disability nor that defendant's conduct disproportionately impacted disabled people. Instead, plaintiffs' accessibility claim must be based on a refusal to accommodate Jessica's disability.

First, plaintiffs do not address the first element, whether Jessica's mobility limitation constitutes a qualified disability. But even assuming she has a qualified disability, plaintiffs do not provide evidence supporting, let alone conclusively establishing, that either of the other elements of her accessibility claims are satisfied. Plaintiffs have not presented evidence supporting that Jessica was denied a service or activity that CPS provides. As was previously discussed regarding the IDEA claims, Jessica was not denied a FAPE. It is undisputed that services were available to provide Jessica with access to the classroom at Hamilton. Also, there is no evidence supporting that CPS would not have accommodated Jessica by placing her elsewhere if the accessibility issues precluded Jessica's participation in the program provided at Hamilton. Instead, evidence supports that CPS offered alternate locations.

Plaintiffs are not entitled to summary judgment on the accessibility claims. Instead, because plaintiffs have not provided evidence supporting essential elements of the accessibility claims, defendant is entitled to summary judgment dismissing the accessibility claims.

IT IS THEREFORE ORDERED that plaintiffs' motion for summary judgment [22] is denied. Defendant's motion for summary judgment [35] is

granted. The Clerk of the Court is directed to enter judgment in favor of defendant

and against plaintiffs dismissing plaintiffs' cause of action with prejudice.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED: APRIL 7 , 2011